## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ZENITH LOGISTICS, INC.,                                Case No. 1:11-cv-301

     Plaintiff,                                            Judge Timothy S. Black

vs.

TEAMSTERS LOCAL UNION NO. 100,

     Defendant.

### ORDER

This civil case is before the Court on Plaintiff Zenith Logistics Inc.'s Motion for

Summary Judgment (Doc. 10), Defendant Teamsters Local Union No. 100's Motion for

Summary Judgment (Doc. 11), and the parties's responsive memoranda (Doc. 12, Doc.

13).  For the reasons stated herein, Plaintiff's motion is **DENIED**, and Defendant's

Motion is **GRANTED IN PART**, enforcing the Opinion and Award of the Arbitrator,

and **DENIED IN PART**, as to recovery of attorney fees.

## I.      BACKGROUND

### A.      Undisputed Facts[1]

Plaintiff Zenith Logistics, Inc. operates the Woodlawn Distribution Center in

Cincinnati to supply grocery products to 112 Kroger stores throughout the region.  (Doc.

10 at 3).  Defendant Teamsters Local Union No. 100 ("the Union") represents Zenith's

160 warehouse employees at the Woodlawn facility.  (Doc. 9, Ex. 1 at 27-34).  Zenith and

---

[1]  The parties have submitted a joint record (Doc. 9).  Unless otherwise noted, all facts
are agreed to by both parties.

the Union are parties to a collective bargaining agreement ("the contract"- Doc. 9, Ex. 3),

which governs the terms and conditions of the warehouse employees.

The contract contains two provisions at issue in this case.  First, Article 20

provides that "No employee shall be discharged without just cause."  (Doc. 9, Ex. 3 at

13).  Second, Article 26 of the agreement provides as follows:

> The Company and the Union acknowledge that they have agreed during the
> negotiations for this Agreement on attendance and engineered labor standards
> discipline policies that are applicable to the bargaining unit employees.  The
> parties agree that these are hereby incorporated by reference into this Agreement.
> The parties further agree that these will not be subject to change except by written
> agreement signed by both the Company and the Union.  (Doc. 9, Ex. 3 at 16).

The Absenteeism and Tardiness Policy adopted by Zenith and the Union provides

that an employee incurs one absence point for each missed day of work. (*Id*. at 18).

Tardiness incurs partial points, depending on the degree of lateness.  (*Id.*).  The policy

provides for progressive discipline: an employee receives a verbal warning after accruing

three points in a six month period, a written warning after five points, a final warning

after seven points, and discharge upon accruing ten points.  (*Id.*). Absences due to court

duty, death in the family, excused union time, pre-approved medical appointments,

industrial injury, and other pre-approved reasons do not incur points. (*Id.*).  Points are

awarded on a rolling six month basis and points are removed from the employee's total

six months after they are incurred. (*Id.*).

Anthony Cain was employed by Zenith as a warehouse employee from October 30,

2007 to June 25, 2010.  Over the course of his employment, Cain was disciplined

-2-

according to the Absenteeism and Tardiness Policy on several occasions. (Doc. 9, Ex.5 at 17). Cain reached the seven point "final warning" threshold on three separate occasions, and each final warning was for a different six month period. (*Id*.).

On January 5, 2010, Cain received a second step discipline in the form of a written warning after accumulating five absenteeism points in the previous six months. (Doc. 9, Ex. 5 at 1). Zenith Warehouse Manager Rick Ellis met with Cain and his Union Steward and Ellis provided both Cain and his Steward a list of the absences that accounted for his absenteeism points that triggered the discipline. (*Id.*). Neither Cain nor the Steward disputed the list or the accumulation of points. (*Id.*).

Cain was tardy twice and absent once in January. (Doc. 9, Ex. 5 at 2). After Cain was absent on February 1st, he received a third step discipline on February 14th in the form of a final warning for accumulating seven absenteeism points in the previous six months. (Doc. 9, Ex. 5 at 2). Ellis again met with Cain and his Union Steward and provided them with the list of incidents triggering the points. (*Id*.). Neither Cain nor the Steward disputed the points assessment. (*Id*.).

Throughout this time period, Cain was also attending to the medical needs of his children. At the arbitration hearing, Cain testified that he was absent on February 1st because he had been seeking treatment for his youngest son at Cincinnati Children's Hospital Medical Center on the night of January 31st and Cain stayed home with the sick child the following day. (Doc. 9, Ex. 6 at 1-2). After Cain's absence on February 1st, his girlfriend watched their son while Cain worked his regularly scheduled shift on February

2nd.  (Doc. 9, Ex. 1 at 11).  Cain was then off on February 3rd and February 4th.  On February 4th, Cain took his son back to the hospital and the child was transferred to the pediatric intensive care unit at Cincinnati Children's Hospital Medical Center.  (*Id.*).  Cain called Zenith to speak with his supervisor, Mike Lackey.  (*Id.*).  Cain informed Lackey that his son was in ICU and requested two weeks to thirty days off.  (*Id.*).  Lackey replied "Anthony, we're busy right now. I can't do it. We need you."  (*Id.*).  Cain then reported to work as scheduled on February 5th.

Cain also testified that he asked Lackey about FMLA.  Lackey replied "We don't have it. See Ron Gray."  (Doc. 9, Ex. 2 at 31, 33).  Cain took this to mean that Zenith did not provide FMLA (rather than Lackey not having the paperwork).  (*Id.*).  Cain testified that during his two and half years working for Zenith, no one in management ever explained his FMLA rights to him.  (*Id.*).

On February 19th, February 21st, and February 26th, Cain was late and received a total of 1.25 absence points.  (Doc. 9, Ex. 5 at 5).  Cain testified that he was late because he was caring for his youngest son, who continued to be ill.  (Doc. 9, Ex. 2 at 121)

Cain's son improved, but towards the end of March he grew ill again.  (Doc. 9, Ex. 1 at 12).  The child was admitted to Children's Hospital on March 31st and was discharged on April 1st.  (*Id.*).  On April 2nd, Cain was permitted to leave work for two hours without penalty to pick up his child and girlfriend from the hospital.  (*Id*. at 14).  Cain informed his supervisors of his son's hospitalization, and was not charged with absences for those days.  (*Id.* at 13).

-4-

On April 13th Cain was again absent from work and received 1 absence point.  On that date, Cain was at a follow up doctor's visit with his youngest son. (Doc. 9, Ex. 6 at 16).  Cain was then absent May 2nd and tardy seven additional times, including on May 8th.  (Doc 9, Ex. 5 at 5) (Doc 9, Ex. 5 at 5). On May 8th, Cain came to work before his scheduled start time and informed his supervisor that he had been at the hospital all night with his girlfriend's son.  (Doc. 9, Ex. 1 at 15).  Cain told his supervisor that he had to leave to go pick up the child and his mother from the hospital, and Cain returned to work at 6:40 a.m., ten minutes after his scheduled start time.  (*Id.*).  Cain showed the hospital discharge papers to his supervisors, who informed him that the reason for his absence did not matter because it was a "no fault policy."  (*Id.*).  Cain was charged ½ an absence point for his tardiness.  (Doc. 9, Ex. 5 at 5).

Cain accumulated his tenth absenteeism point in the previous six months on June 18, 2010.  (Doc. 9, Ex. 5 at 5).  Zenith provided Cain with an up to date list of his absences and suspended Cain pending a pre-discharge hearing and final decision.  (*Id.*). The pre-discharge hearing was held on June 24, 2010 and was attended by Cain, Mike Lackey, Zenith Vice President Richard Grau, Union Business Agent Mark Overberg, and Chief Union Steward Mike Hall.  (Doc. 9, Ex. 2 at 10).  At the hearing, Cain objected only to the ½ point he had received for being 30 minutes tardy on May 8th.  (*Id.* at 11).

On June 28, 2010 Grau notified Cain in writing that he had reviewed Cain's objection and determined that the ½ point had been properly assessed for his May 8th tardiness because the child Cain was caring for was the son of his girlfriend, and in

Grau's view this absence was therefore not eligible for FMLA leave.[2]  (Doc. 9, Ex. 5 at

6).  Grau also informed Cain that he had accumulated ten absenteeism points and was

therefore terminated in accordance with the provisions of the contract. (*Id.*).

On July 1st, Cain submitted FMLA paperwork in relation to his February 1st

absence.  (Doc. 9, Ex. 5 at 7-9).  Grau responded to Cain in a letter dated July 9, 2010,

informing him that his request for FMLA leave was denied.  (Doc. 9, Ex. 5 at 16).  Grau

denied the request because he found Cain's paperwork untimely, Cain did not specify

why he needed time off when he called in on February 1st, Cain had not mentioned the

February 1st absence when he later received time off to care for his son, and he did not

challenge the absence point at the grievance hearing.  (*Id.*).  Grau reiterated his position

that the grievance was denied and Cain was terminated effective June 28, 2010.  (*Id.*).

### B.    Procedural History

Under Article 25 of the Contract, the Union may appeal Zenith's discipline

decisions to arbitration.  (Doc. 9, Ex. 3 at 16).  The decision of the arbitrator is binding on

Zenith, the Union, and the grievant.  (*Id.*).  Further, the contract provides that "the

arbitrator shall not have the power to add to, subtract from or modify this Agreement."

(*Id.*).  On June 24, 2010, the Union filed a grievance to protest Cain's discharge, alleging

that his termination violated the contract's provision that employees only be terminated

---

[2]  The child in question is the biological son of Cain's live-in girlfriend.  (Doc. 9, Ex. 1 at 15).  FMLA does provide coverage for individuals who are *in loco parentis* to a child and not merely biological parents, and the arbitrator found that Cain would meet the standards for *in loco parentis*.  (*Id.* at 26).  However, at the arbitration hearing, the Union did not seek to obtain FMLA coverage for the May 8th tardiness.  (*Id*. at 15).

for just cause.  (Doc. 9, Ex. 4).

Cain's grievance was heard by arbitrator Barbara W. Doering on November 11, 2010.  (Doc. 9, Ex. 2 at 1).  At the hearing, the arbitrator took testimony from Cain, warehouse manager Erick Ellis, and Zenith Vice President Richard Grau. (Doc. 9, Ex. 2 at 1).

The arbitrator issued a decision on April 1, 2011, finding in favor of the Union. (Doc. 9, Ex. 1).  The arbitrator found that discharge under the Absenteeism and Tardiness Policy negotiated and incorporated into the contract is still subject to consideration by an arbitrator as a matter of "just cause" under Article 25 of the contract.  (*Id*. at 25). The arbitrator also found that "generally" any absenteeism points that had been subject to prior discipline must have been challenged at the time of the discipline, noting that "it seems reasonable that requests for leniency, compassion, or FMLA, need to be raised at the time of Warnings."  (*Id*. at 27-28).  However, the arbitrator also found that if "there is a different kind of issue that supports consideration of situation that developed prior to the Final Warning, it is reasonable that the situation be considered, but not having been raised at the time of Warning could affect what should be done about it." (*Id*.).

In the arbitrator's view, the company's handling of FMLA leave constituted such a "different kind of issue."  Grau testified that it was company policy to provide employees with leave to care for sick children without requiring the filing of formal FMLA paperwork.  (Doc. 9, Ex. 1 at 20).  To obtain excused leave for family medical reasons, the employee must provide the company with the specific reason when calling in an

absence and obtain a note verifying the situation from the medical provider.  (*Id.*).  The policy itself, however, makes no mention of excused absences for family illness, nor does it make any mention of FMLA leave.  (*See* Doc. 9, Ex. 3 at 18).

The Union argued that the company's procedures were insufficient because employees may not know enough about FMLA to realize they could be excused from absence points for serious family illness, and the employees would not therefore realize they should provide such information to the company.  (Doc. 9, Ex. 1 at 20-21).  The Arbitrator found that "in the matter of the FMLA arguments, the Company has not shown that it responded fairly when the grievant requested time off in connection with a child in his family being in the hospital."  (*Id*. at 28).

The arbitrator thus concluded that under the circumstances of this case, discharge was unjust and reinstatement was appropriate.  (*Id*. at 28).  Notably, she did not find that any of the specific points were inappropriately awarded.  The arbitrator did, however, find that Cain "bears some responsibility for some of the confusion" and was therefore not entitled to full back pay.  (*Id.*).  Instead, the arbitrator awarded the following remedy:

1.  Cain is to receive a six week make-whole remedy.  The company shall consider the period of February 14, 2011 to April 1, 2011 as time worked without any points under the Absenteeism and Tardiness Policy and the time-worked requirement of FMLA.

2.  The period between the issuance of the termination on June 28, 2010 and February 14, 2011 shall be treated as a suspension or time off work in which Cain accumulates seniority but is not made whole.

3.  The ten month period prior to June 28, 2010 shall be carried forward, as if the intervening period of time off did not exist, for purposes of discipline

-8-

and the time-worked requirement for eligibility for FMLA.

4.     Cain's rolling six-month period for purposes of the Absenteeism and
       Tardiness policy shall be deemed to have begun on February 14, 2010.

5.     Within a week of Cain's reinstatement, Zenith shall calculate Cain's current
       point total and advise him of where he stands.  (*Id*. at 29).

On May, 9, 2011, Zenith filed a Complaint (Doc.1) in this Court seeking an order

vacating the Opinion and Award of the arbitrator pursuant to Section 301(a) of the Labor

Management Relations Act, 29 U.S.C. § 185, and the Federal Arbitration Act, 9 U.S.C.

§ 1.  The Union filed an Answer (Doc. 4) and asserted a counterclaim seeking an order to

enforce the arbitration award.  The parties each filed a motion for summary judgment

(Doc. 10, Doc. 11) on October 3, 2011, and they each filed a response in opposition to the

opposing party's motion (Doc. 12, Doc. 13) on October 24, 2011.

## II.     STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine

disputes over facts which, under the substantive law governing the issue, might affect the

outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be

construed in a light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## III.    ANALYSIS

Plaintiff seeks summary judgment on its complaint to vacate the labor arbitration award.  (Doc. 10 at 1).  Defendant, in turn, seeks summary judgment on its counterclaim to enforce the award.  (Doc. 11 at 1).  Additionally, Defendant seeks attorneys' fees and costs incurred in this litigation.  (*Id*. at 17).

### A.    The Arbitration Award

Federal courts have limited authority to review the merits of an arbitration award. In *United Paper Workers Int'l Union v. Misco*, 484 U.S. 29, 37-38 (1987), the Supreme Court summarized the deference due to arbitration decisions:

Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept . . . An arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject the award on the grounds that the arbitrator misread the contract. . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

"However, an arbitrator's award must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Misco*, 484 U.S. at 38. When the arbitrator fails to adhere to this requirement, she has exceeded the scope of her authority and the courts will not enforce the award. *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

The Sixth Circuit has established a three-part test for evaluating the propriety of arbitration awards: (1) did the arbitrator act outside his authority by resolving a dispute not committed to arbitration? (2) did the arbitrator commit fraud, have a conflict of interest, or otherwise act dishonestly in issuing his award? and (3) in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract?. *Mich. Family Res., Inc. v. Serv. Emp. Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007). "So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made serious, improvident, or silly errors in resolving the merits of the dispute." *Id.* (internal citations omitted).

In this case, the parties do not dispute that the arbitrator resolved a dispute within

-11-

her authority, nor do they allege that she committed fraud or acted dishonestly; the parties focus their arguments exclusively on the third prong of *Michigan Family Resources* concerning whether the arbitrator was "arguably construing or applying the contract." (Doc. 10 at 14; Doc. 11 at 10). Plaintiff argues that the arbitrator's award did not draw its essence from the contract because she disregarded the plain and unambiguous language of the agreement. (Doc. 10 at 13). Specifically, the Plaintiff contests the arbitrator's finding that the absenteeism policy is superceded by the just cause provision in Article 20 of the agreement. (*Id*. at 14).

Plaintiff primarily relies on *General Drivers, Warehousemen and Helpers, Local 89 v. Willamette Indus., Inc.*, No. 98-5476, 1999 WL 503465 (6th Cir. July 6, 1999) to support its argument that the absenteeism provisions are not subject to review for "just cause."(*Id*. at 15). In *Willamette*, the union and the company had a contract which provided that employees could be discharged for good cause and that employees could be discharged for violations of agreed upon "house rules." *Willamette*, 1999 WL 503465 at *2. The arbitrator found that while it was undisputed that the employee had broken the house rules, discharge was not appropriate under the good cause standard. (*Id.*). The Sixth Circuit found that under the plain language of the contract, "A finding of good cause is therefore unnecessary to uphold the employer's discharge penalty as long as there is a finding that an employee violated a house rule." *Id*. at *4. The court therefore held that the arbitrator's award did not draw its essence from the contract because it failed to heed the unambiguous language of the document and vacated the award. *Id*. *See also*

-12-

*S.D. Warren Co. v. United Paperworkers Int'l Union, AFL-CIO*, 845 F.2d 3, 8 (1st Cir. 1988) (vacating the arbitrator's award where the arbitrator applied the just cause provision to other discharge requirements because the award failed to draw its essence from the contract.).

However, the Sixth Circuit's more recent decision in *Michigan Family Resources* clarifies that courts should no longer evaluate arbitration awards only under the "essence of the contract" standard employed by the court in *Willamette*. The relevant standard for determining whether an award is permissible is now whether the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority." *Mich. Family Res.*, 475 F.3d at 752-753 (citing *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). "[I]n most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *Id.*

In this case, the arbitrator's award is clearly derived from her interpretation of the contract. In a lengthy thirty page opinion, the arbitrator engaged in a rigorous analysis of whether Zenith violated the contract. The arbitrator attempted to reconcile provisions regarding absenteeism, seniority, and discharge before ultimately concluding that discharge under the Absenteeism and Tardiness Policy is subject to consideration by an arbitrator as a matter of just cause. (*See* Doc. 9, Ex. 1 at 25). Further, the arbitrator engaged in analysis over whether the contractual provisions barred review of absence points accrued prior to the final warning. (*Id.* at 28). Plaintiff may disagree with the

-13-

arbitrator's interpretation of the contract, but the Court finds it clear that the arbitrator was engaging in interpretation. *See also Titan Tire Corp. of Bryan v. United Steelworkers of Am. Local 890L*, 636 F.3d 368, 371(6th Cir. 2011) (finding that it was "indisputable that the arbitrator was construing and applying" the contract when he found that a just cause provision applied to a provision of the contract holding that employees who failed drug tests were "subject to termination").

The Court finds that the arbitrator was arguably construing and applying the contract. Plaintiff's motion to vacate the arbitration award is therefore **DENIED,** and Defendant's motion to enforce the arbitration award is therefore **GRANTED**.

### B.     Defendant's Request for Attorney's Fees

Generally, a prevailing party may not recovery attorneys' fees in the absence of a statute or enforceable contract providing for a fee award. *Monroe Auto Equip. Co. v. United Auto Workers*, 981 F.2d 261, 269 (6th Cir. 1992). There is no such statutory or contractual provision in this case. However, the Court may award the prevailing party its attorneys' fees if it determines that the losing party has "acted in bad faith, vexatiously, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258 (1975).

Here, Defendant argues that Zenith acted in bad faith by bringing this action because the company's complaint rests only upon a disagreement with the arbitrator's decision. (Doc. 11 at 18 (citing *Dreis & Krump v. Int'l Ass'n of Machinists Dist No. 8*, 802 F.2d 247, 254 (7th Cir. 1986))). In *Dreis*, the court awarded fees after concluding

-14-

that the "company had no ground for challenging the [arbitrator's] decision in court; also it filed this suit after the statute of limitations had run." 802 F.2d at 270. The facts in this case are distinguishable. Plaintiff has consistently acknowledged the Court's limited scope of review and challenged the award because it felt the arbitrator was not arguably interpreting the contract. Further, Plaintiff made a good faith effort to analogize this case to Sixth Circuit cases in which the arbitrator's award was vacated. *See Monroe*, 981 F.2d at 249 (finding that acknowledgment of the proper legal standard and efforts to analogize were sufficient to establish good faith in bringing the suit).

The Court finds no basis to determine that Plaintiff acted in bad faith. Defendant's motion for attorneys' fees is therefore **DENIED**.

## III.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Doc. 10) is **DENIED**. Defendant's Motion for Summary Judgment (Doc. 11) is **GRANTED IN PART** and **DENIED in PART**. Specifically, Defendant's motion to enforce the arbitration award is **GRANTED**. However, Defendant's motion for attorney's fees is **DENIED**. And this case is ordered **CLOSED**, upon entry of Judgment by the Clerk.

IT **IS SO ORDERED**.

Date: ___2/1/2012___

_Timothy S. Black_
Timothy S. Black
United States District Judge

-15-